```
  1                    UNITED STATES DISTRICT COURT

  2                    WESTERN DISTRICT OF NEW YORK

  3

  4    - - - - - - - - - - - - - X
       UNITED STATES OF AMERICA              20-CR-79(V)
  5
       vs.
  6                                          Buffalo, New York
       DEYANNA DAVIS,                        June 23, 2020
  7              Defendant.
       - - - - - - - - - - - - - X
  8

  9              TRANSCRIPT OF VIDEO PROCEEDINGS
           BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
 10              UNITED STATES MAGISTRATE JUDGE

 11

 12                      JAMES P. KENNEDY, JR., ESQ.
                         United States Attorney
                         BY: SETH T. MOLISANI, ESQ.
 13                      Assistant United States Attorney
                         138 Delaware Avenue
 14                      Buffalo, New York 14202

 15
                         DOLCE PANEPINTO, PC
 16                      BY: SAMUEL P. DAVIS, ESQ.
                         1260 Delaware Avenue
 17                      Buffalo, New York 14209
                         Appearing on behalf of the Defendant
 18

 19    ALSO PRESENT:      Curtis Middlebrooks, U.S. Probation Office

 20
       AUDIO RECORDER:    Joanna Dickinson
 21

 22    TRANSCRIBER:       Christi A. Macri, FAPR-CRR-RMR-CSR(CA/NY)
                          (585) 613-4310
 23                       Kenneth B. Keating Federal Building
                          100 State Street, Room 2120
 24                       Rochester, New York 14614

 25    (Proceedings recorded by electronic sound recording,
       transcript produced by computer).
```

1                          **P R O C E E D I N G S**

2                               *    *    *

3              (**WHEREUPON**, the defendant is present).

4              **THE CLERK:** We are on the record in criminal

5      proceeding No. 20-CR-79, United States vs. Deyanna Davis,

6      et al..

7              We are here for a detention hearing.

8              Ms. Davis is present by video with her attorney Sam

9      Davis.

10             For the Government AUSA Seth Molisani.

11             And from the United States Probation Office Curtis

12     Middlebrooks by audio only.

13             The Honorable Jeremiah J. McCarthy presiding.

14             **MAGISTRATE JUDGE MCCARTHY:** Good afternoon,

15     everyone.

16             **MR. DAVIS:** Good afternoon, Your Honor.

17             **MR. MOLISANI:** Good afternoon, Your Honor.

18             **MAGISTRATE JUDGE MCCARTHY:** Ms. Davis, can you see

19     and hear me?

20             **THE DEFENDANT:** Yes.

21             **MAGISTRATE JUDGE MCCARTHY:** And we all agree to

22     proceed by video today rather than in person due to the

23     COVID-19 pandemic?

24             **THE DEFENDANT:** Yes.

25             **MR. DAVIS:** Yes, Your Honor.

1            **MAGISTRATE JUDGE MCCARTHY:** Mr. Molisani?

2            **MR. MOLISANI:** Yes, Your Honor.

3            **MAGISTRATE JUDGE MCCARTHY:** Okay.  All right, it's

4   the Government's motion for detention so I'll hear from you,

5   Mr. Molisani.  I know you proffered at the last proceeding.

6   If there's anything you wish to add I'll hear from you.

7   Otherwise, I'll hear from Mr. Davis.

8            **MR. MOLISANI:** Your Honor, before I begin would the

9   Court -- I know we have some additional people that have

10  phoned in -- advise them they're not to record this proceeding

11  or reproduce it in any way?

12           **MAGISTRATE JUDGE MCCARTHY:** Yes, that's correct.

13  This is a public proceeding, but just as if we were in person,

14  no portion of the proceeding may be recorded or reproduced in

15  any -- in any manner other than the official recording.

16           **MR. MOLISANI:** Thank you, Your Honor.

17           Your Honor, as the Government noted on Thursday --

18  and that's actually another thing.  Does the Court wish to

19  complete -- there was some concern about Ms. Davis not having

20  fully completed the arraignment because she did not have a

21  copy of the --

22           **MAGISTRATE JUDGE MCCARTHY:** Oh, yes, thank you for

23  reminding me.

24           Ms. Davis, have you now received a copy of the

25  indictment?

1          **THE DEFENDANT:** I did.

2          **MAGISTRATE JUDGE MCCARTHY:** All right. And,

3  Mr. Davis, do you wish to have the indictment -- do you waive

4  the formal reading of the indictment?

5          **MR. DAVIS:** Yes, I do, Your Honor.

6          **MAGISTRATE JUDGE MCCARTHY:** And how does Ms. Davis

7  plead?

8          **MR. DAVIS:** Not guilty, Your Honor.

9          **MAGISTRATE JUDGE MCCARTHY:** Okay, thank you.

10          Mr. Molisani.

11          **MR. MOLISANI:** Thank you, Your Honor.  Your Honor,

12  as the Government indicated on Thursday when we began the

13  arraignment proceedings, we are moving for detention of this

14  particular defendant pursuant to Title 18, United States Code,

15  Section 3142(f)(1)(E) which relates to any offense that

16  involves the possession of a firearm.

17          The Court is aware the defendant is charged with

18  one count of felon in possession of a firearm in violation of

19  Title 18, United States Code, Section 922(g)(1) and Section 2.

20          Now, Your Honor, we turn to the factors set forth

21  under 18, U.S.C., 3142(g) when determining if detention is

22  warranted, and the first factor to consider is the nature and

23  circumstances of the offense, and the Government did provide

24  an outline -- or a synopsis of the events that occurred on

25  June 1st, 2020.

1          I will briefly recite those -- those facts again or

2 those circumstances.  Specifically, Your Honor, this case

3 stems from the civil unrest that followed protests and

4 demonstrations on June 1st, 2020, in the City of Buffalo.

5          New York State Police and the Buffalo Police

6 Department responded to the area of Bailey Avenue in the

7 vicinity of the E District stationhouse to address crowds that

8 had -- had convened there.  There were crowds blocking the

9 street and in violation of the curfew that had been set.

10          And while forming that perimeter on Bailey Avenue

11 and attempting to disperse individuals congregating in the

12 street, an SUV operated by this defendant, Deyanna Davis,

13 approached law enforcement at a high rate of speed.  Ms. Davis

14 continued accelerating in the wrong lane of travel in the

15 direction of law enforcement and eventually careened into a

16 police line injuring very seriously a New York State police

17 officer, fracturing his pelvis and causing other injuries,

18 including broken ribs.

19          This incident also caused injury to at least one

20 Buffalo police officer, and I believe there was a third law

21 enforcement officer who was also injured.

22          Ms. Davis' vehicle hit the police line, law

23 enforcement did open fire wounding Davis.  There were, I

24 believe, a total of four shots fired by New York State Police;

25 two of those shots struck Ms. Davis, she was struck in the

1  abdomen, which caused an injury, I believe to her liver, as

2  well as a graze wound across her shoulders.

3         Davis continued on operating the vehicle after

4  striking and running over the police officer, fleeing from the

5  scene before turning down a side street, Connelly Place, and

6  driving the vehicle at a high rate of speed halfway down that

7  block before coming to a stop.

8         At that point Ms. Davis and the front seat

9  passenger of the vehicle, Walter Stewart, were immediately

10 taken into custody by pursuing police units.

11        Prior to those police units apprehending Ms. Davis

12 and Mr. Stewart, the rear passenger in the vehicle, Semaj

13 Pigram, exited and was able to flee on foot, but he was

14 apprehended a short time later with the help of aerial

15 surveillance units that were in the area.

16        Subsequent to the detention of Ms. Davis and Mr.

17 Stewart, New York State Police recovered a loaded

18 Smith & Wesson 9 millimeter semi-automatic handgun from the

19 rear passenger floor, as well as a spent shell casing in the

20 rear passenger area of the vehicle, a spent shell casing on

21 top of the vehicle and also a live 9 millimeter round on the

22 back seat.

23        All of these were consistent with 9 millimeter

24 ammunition, and as I will detail later based on the police

25 ballistics reports -- I'm sorry, the lab ballistics reports,

1 | the spent shell casings were fired from the recovered

2 | 9 millimeter handgun.

3 |       With respect to the weight of the evidence, Your

4 | Honor, at this time I'd like to play a video that is a

5 | compilation of different vantage points that were recovered by

6 | New York State Police during the course of their

7 | investigation.  I will attempt to provide some narration just

8 | to sort of guide all the parties that are viewing this to

9 | certain landmarks or things that I'm trying to highlight.

10 |       So hopefully that will -- that will work.  I'm

11 | going to do that now.  I'm going to share the screen and

12 | hopefully that will assist me in -- the video begins on --

13 | it's a Buffalo City camera, Your Honor, located at Bailey and

14 | Connelly Place looking southbound on Bailey Avenue toward

15 | where Ms. Davis was operating her vehicle.

16 |       And at the beginning of the video Ms. Davis'

17 | vehicle is parked alongside of a Metro bus and in the

18 | forefront, in the foreground of the video you're going to see

19 | the police line that I described across Bailey Avenue as they

20 | tried to disperse the crowd that had gathered in the street.

21 |       So everyone should see in the foreground that there

22 | are police vehicles with lights on.  There's a line of police

23 | officers across the street.  And you should see sort of in the

24 | background a Metro bus.  And to the right of that bus is

25 | parked the vehicle -- the SUV that was operated by Ms. Davis.

1          **MR. DAVIS:** There's no audio with this --

2          **MR. MOLISANI:** There's no audio in this portion.

3   There will be audio -- as you -- as you watch this, there are

4   several social media accounts that have video of this event

5   and there will be audio with those and they will be juxtaposed

6   with this video to provide some perspective.

7          So you'll see that for several minutes Ms. Davis

8   was parked alongside the city bus.  You'll have the

9   opportunity to observe -- and actually now you're going to

10  see -- there's a highlighted portion magnifying the rear

11  driver passenger door on her vehicle is open and you can see

12  what appears to be a human form or arm in that area extended

13  out of the vehicle.

14         **MR. DAVIS:** What was the smoke that we saw emanating

15  from in front of the vehicle just now?  What is that smoke?

16         **MAGISTRATE JUDGE MCCARTHY:** Mr. Molisani, Mr. Davis

17  has asked a question.

18         **MR. MOLISANI:** I believe that smoke is from a tear

19  gas canister that was set off by law enforcement as they were

20  trying to disperse the crowd.

21         The audio that you heard to the right, I don't know

22  if Mr. Davis spoke over it or if everyone could hear it, but

23  you can hear clearly the multiple gunshots being fired.

24         Here's another video.  And those gunshots coincide

25  with the time that that rear passenger door is open and that

1  individual appears in that door frame.  You've now seen two

2  social media videos that the audio from the gunshots can be

3  heard pretty clearly.

4          This third video is from inside the NFTA bus that

5  will be paired with the opening of that rear driver passenger

6  door.  And Ms. Davis' vehicle is the vehicle that's observed

7  parked alongside of the bus here.  On this video you can

8  actually see that the front passenger door also opens briefly.

9          The next videos are going to display the aerial

10  footage that was created by the aerial surveillance units.

11  There are two of them.  At this point you can see the vehicle

12  heading toward -- driving into the police line and then

13  escaping onto Connelly Place.  You can actually see defendant

14  Pigram running off from the vehicle at the tail end of that

15  video.

16          This is another helicopter that produced footage.

17  You can see the front right passenger door open and an

18  individual, Semaj Pigram, exit the vehicle and flee.  The

19  police arriving almost contemporaneously.

20          So this photograph that I'm now displaying for

21  everyone's view is a photograph taken by New York State Police

22  of the rear area of the SUV that Ms. Davis was operating, you

23  can see in the lower right-hand portion is a spent shell

24  casing on these pair of denim shorts.  In the center of the

25  photograph on the middle of the seat is a live 9 millimeter

1  round.  And toward the -- right behind the driver's seat here

2  you can see circled the firearm, the 9 millimeter handgun that

3  was recovered, and that gun was a stolen firearm as determined

4  by State Police.

5           Now, this photograph is from the opposite side of

6  the vehicle.  You can see the live 9 millimeter round right

7  here in the center on the middle seat and this gives you a

8  better view of where the handgun was recovered on the floor

9  passenger area just behind the driver's seat.

10          This next photograph is one of the spent shell

11  casings that was recovered from the roof of Ms. Davis'

12  vehicle.

13          Now, Ms. Davis gave an interview to the police

14  following these events.  She claimed that prior to driving off

15  in the direction of the police line, that she was struck by

16  gunfire and that is refuted by the evidence that the New York

17  State Police has gathered.

18          And this picture that I'm -- I'm displaying to

19  everyone is a photograph that was part of the New York State

20  Police shooting reconstruction that occurred.  New York State

21  Police was able to determine that the four shots fired by

22  State Police caused the wounds that Ms. Davis suffered.  You

23  can see the orange line right here.  That's a shot that went

24  through the door, struck Mr. Stewart and grazed him, and then

25  struck Ms. Davis in the abdomen.

1          You can also see the yellow line above that that

2    would have caused the graze wound across her shoulders.  You

3    can see that's in line with the vehicle having essentially

4    struck the police line at that point so they were

5    perpendicular to each other at the time of the shooting.  She

6    was not struck at some time before she began driving her

7    vehicle in the direction of New York State Police and Buffalo

8    Police Department members.

9          You can see two other lines as well that caused

10   additional damage to the vehicle, and those both come from

11   behind after the vehicle had already struck the law

12   enforcement officer.

13         And here's another photograph showing the angle of

14   those shots.  And you can see this is the exit -- on the front

15   windshield of the vehicle that Ms. Davis was operating.  That

16   was one of those lines from above.  I can direct you to which

17   one that was.  That is the yellow line, I believe, that went

18   through the vehicle and then out through the front windshield.

19         And you can determine based on what New York State

20   Police explained to me that this was not an entry, but an exit

21   based on the fraying of the glass in that -- in that

22   direction.  And I've indicated that with arrows to help

23   illustrate that a little bit better.

24         Your Honor, at this point there has been additional

25   testing obviously since the time of the initial event and the

1    time that the indictment was returned.  There were eight fired

2    shell casings -- 9 millimeter shell casings recovered from

3    Bailey Avenue in the area where I highlighted with the video

4    where you see the rear driver door open and what appears to be

5    a shadow of an arm or some other body part extending out of

6    that area.

7                We believe that those shots were fired from the

8    vehicle and there are 9 millimeter shell casings that are

9    recovered in the aftermath of this in the vicinity of that

10   location.  One of those fired shell casings was ballistically

11   matched to the firearm that was recovered.

12               In addition to that, examination of the -- one of

13   the shells -- fired shells on top of the car as well as the

14   one inside the car were both also matched ballistically to the

15   firearm that was recovered.

16               So it seems very evident based on the evidence that

17   while Ms. Davis was parked beside the bus that one of the

18   occupants, most likely Semaj Pigram, fired all of those shots

19   up into the air or into the ground in the vicinity of her

20   vehicle, and that's before the doors of the vehicle close and

21   before Ms. Davis then puts the car into drive and proceeds in

22   the wrong lane of traffic toward the line of police.

23               In her statement she admitted to seeing the police

24   lights as well as the crowd gathered there in the street

25   before she drove in that direction.

1          The DNA evidence that we have subsequently obtained

2   excludes both Ms. Davis and the front seat passenger Walter

3   Stewart.  However, the rear passenger, Semaj Pigram, cannot be

4   excluded from the DNA on the firearm itself or on the magazine

5   that was recovered from the firearm.

6          I note as well, Your Honor, that Ms. Davis during

7   the course of her interview indicated that Semaj Pigram was

8   the rear seat passenger and that Walter Stewart was in the

9   front seat of the vehicle.

10          She also admitted consuming alcohol and ecstasy on

11   that day prior to these events occurring.

12          Now, as defense counsel pointed out, I believe it

13   was Mr. Davis as well as Mr. Singer and Ms. Covert on

14   Thursday, that possession can be either actual, constructive

15   or joint.  It's the Government's position in this case that

16   Ms. Davis exercised constructive possession over this firearm

17   based on the fact that she was the driver of this vehicle.

18          The firearm was in open view.  I don't think

19   there's anyway of debating that she was aware that the firearm

20   was discharged based on the fact that it was coming from

21   directly behind her with an open door and multiple, multiple

22   shots that did not cause her to drive off after the first shot

23   or the second shot or the eighth shot or the ninth shot.  She

24   remained stationary until all the shots were discharged; she

25   waited until those doors were all closed before continuing on

1    toward the police line.

2              And so constructive possession allows an individual

3    can possess a gun within the meaning of the statute without

4    ever physically handling the firearm.  And in addition to

5    that, possession need not be exclusive.

6              So it's our position that the strength of this

7    case, the strength of the evidence in this case is profound in

8    that Ms. Davis exercised control, dominion over the premises

9    in which the firearm was located.  And it's of no consequence

10   that other individuals may have also exercised control over

11   the weapon because, again, constructive possession may be

12   either sole or joint.

13             And there have been a number of cases that have

14   found that there's sufficient evidence for an operator of a

15   vehicle to be convicted of constructively possessing a firearm

16   that -- that's never actually in their possession,

17   including -- I'd like to point out one in particular to the

18   Court, *United States vs. Speer*, 30 F.3d 605, 611.  It's a

19   Fifth Circuit case from 1984 that held that a defendant had

20   constructive possession of a weapon where the defendant was

21   the driver of a vehicle in which a passenger was in visible

22   possession of a firearm.

23             And so, Your Honor, ultimately the firearm here was

24   located in close proximity to all three occupants and based on

25   the ballistic evidence, the firearm was likely fired from the

1  vehicle repeatedly.  So each occupant knew the firearm was

2  present.

3           Firearm was recovered in a place where each

4  occupant had access to it.  Its location on the back seat

5  floor and the extreme actions of the driver to avoid

6  apprehension and recovery of the weapon is consistent with all

7  three occupants jointly and constructively possessing the

8  firearm.

9           I'd also note that Ms. Davis is charged under

10  Section 2, which is the aiding and abetting statute, and while

11  aiding and abetting one must do more than merely be present at

12  the scene of a crime and have knowledge of its commission,

13  there's certainly more here.

14           It's necessary under the law that a defendant act

15  in some sort to associate him or herself with the venture,

16  they participate in it, it's something they wish to bring

17  about, they seek by this action to make it succeed.

18           The Government must prove some active participation

19  or encouragement or some affirmative act by the defendant

20  designed to further the crime.  And here Ms. Davis was aware

21  the firearm was in the vehicle and, again, I've said it a few

22  times, that much is clear because she took -- she didn't take

23  off immediately until all of these shots were fired; didn't

24  take off before those doors were closed; she remained

25  stationary beside the bus through all of these events and it

1   wasn't until all the doors were closed, all the shots were

2   fired that she then drove off.

3           And then she took very drastic action to prevent

4   recovery of the firearm striking law enforcement officers in

5   her efforts to avoid apprehension and the apprehension of the

6   other occupants in the vehicle.

7           Ms. Davis is the operator of the vehicle in which

8   the firearm was recovered, was the custodian of the vehicle

9   and exercised dominion and control over it and its contents.

10          Now, turning to the history and characteristics of

11  the person, with respect to mental condition, Ms. Davis

12  reported in her -- in her Pretrial Services report that she

13  was uncertain if she had ever been diagnosed with a mental

14  illness, but her mother reported that she'd been diagnosed

15  with bipolar disorder, manic depression and severe depression.

16          With respect to work history, the defendant is 30

17  years old with essentially no prior work history.

18          With respect to drug or alcohol use, Ms. Davis

19  admitted the use of alcohol, but denied the use of any other

20  illicit drugs.  However, as I stated earlier, during her

21  interview with police she acknowledged consuming alcohol on

22  the day of these events as well as consuming ecstasy and

23  marijuana as well.

24          So she -- I don't know if she was simply mistaken

25  in her interview with -- with Pretrial Services, with

1    Probation, or if she intentionally stated that inaccurately

2    that she did not use other illicit drugs.

3            But I also had an opportunity to speak with

4    Christine Griffin at the Erie County Toxicology Lab regarding

5    the defendant's sample from June 1st, and those preliminary

6    results identify not only synthetic cathinone, which is

7    essentially a synthetic MDMA, ecstasy, but it also identified

8    cocaine metabolites, indicating that the defendant had

9    consumed cocaine earlier that day, as well as morphine and

10   fentanyl in her sample, and they're working to finalize their

11   reports on that; she was only able to give me a preliminary

12   verbal report today.

13           With respect to the criminal history of the

14   defendant, Ms. Davis was convicted of attempted robbery in the

15   second degree, which is a Class D violent felony, in Erie

16   County Court on March 15th, 2010.

17           **MAGISTRATE JUDGE MCCARTHY:** You're breaking up.

18           **MR. MOLISANI:** I'm sorry?

19           In that case she was convicted of stealing a purse

20   and credit cards from another young female victim.

21           She's also been convicted of several misdemeanors,

22   including in 2015 attempted petit larceny.

23           In 2014, and I think this is something that really

24   should be considered by the Court as well, she was convicted

25   of two counts of attempted tampering of a witness.  And those

1   charges stemmed from her boyfriend at the time was on trial

2   for B felony drug possession and there were several civilians

3   who cooperated in the prosecution of that case.  She at the

4   behest of her then boyfriend obtained Rosario material, 3500

5   material for federal purposes, but statements of those

6   civilian witnesses.  She took those statements and put those

7   on Facebook with comments about -- negative comments about the

8   participation of those witnesses in the trial.

9           As a result of the posting of those materials,

10  those witnesses were threatened and, in fact, one of those

11  witnesses was not available for trial because he could not be

12  located based on the threats that he had received as a result

13  of cooperation.

14          So it's much more significant than a misdemeanor

15  charge.  Those charges really undermine the entire criminal

16  justice system when witnesses are threatened and intimidated

17  from participating in the process.

18          With respect to Ms. Davis' record of court

19  appearances, Your Honor, she does have a warrant that was

20  issued for her arrest for non-appearance.  It was remote, it

21  was back in 2009.

22          Finally, with respect to the nature and seriousness

23  of the danger to any other person or the community that the

24  defendant would pose should she be released, I think she's

25  demonstrated during the course of her criminal history she

1  has with respect to every case placed someone in danger,

2  whether it was the robbery victim, whether it was the three

3  civilian witnesses in the trial of her boyfriend that were

4  placed in harm's way, or the offense here.

5          I think the facts of this case alone demonstrate

6  that the defendant is a danger to the community.  She consumed

7  alcohol, consumed drugs, operated a vehicle with two other

8  individuals, one individual I think pretty clearly was the one

9  who was in actual possession of this firearm, allowed that

10 person to discharge the firearm from the vehicle.

11         And I say that because she doesn't drive off, she's

12 not startled by what's occurring in her own car.  She waits

13 until all of those shots are fired, until the person is back

14 in the car with the door secure before she then drove the

15 vehicle headlong into the police line.

16         And you can see from the video that other vehicles

17 are turning around, other vehicles are avoiding that

18 intersection completely, and she has the opportunity to do

19 that as well but instead drives in the wrong lane of traffic

20 and speeds up toward the police line knowing full well, and

21 she admitted that she saw police lights there, she saw people

22 there, she knew the risks that were -- that existed in driving

23 in that direction, but she did so willfully and she did so so

24 this co-defendant of hers could get away.

25         And then she continued -- after she had already run

1  over one officer, she continued at a high rate of speed in an

2  attempt to flee from the scene.  But I believe ultimately the

3  reason why she stops is because she was, in fact, wounded

4  herself.  Otherwise, she probably would have continued going.

5           I think that demonstrates and establishes clearly

6  this defendant is a danger to the community, Your Honor.  I'd

7  also note that United States Probation in this case,

8  Mr. Middlebrooks, interviewed Ms. Davis independently and he

9  came to the conclusion as well that he recommends detention to

10 this Court.

11          So based on those foregoing facts and

12 circumstances, it's the Government's position that no

13 condition or combination of conditions will assure the

14 defendant's reappearance for trial and that no conditions of

15 release will assure the safety of the community.

16          It's the Government's position that we have

17 established danger by clear and convincing evidence, and so

18 the Government asks for this Court to detain the defendant

19 pending trial.

20          **MAGISTRATE JUDGE MCCARTHY:** Thank you.  Before I

21 hear from Mr. Davis, is Ms. Davis still in state custody?  Is

22 she being held?  Or has she been released?

23          **MR. DAVIS:** Ms. Davis is still in custody, Your

24 Honor .

25          **MAGISTRATE JUDGE MCCARTHY:** Okay.  So I guess my

1  initial question is what are we doing today?

2       **MR. DAVIS:** Today we're running a detention

3  hearing --

4       **MAGISTRATE JUDGE MCCARTHY:** I understand that,

5  Mr. Davis, but even if I were to say she can be released,

6  she's not going to be released.  Why are we holding this

7  hearing today?

8       **MR. DAVIS:** Tomorrow I'm conducting a felony hearing

9  on her behalf and I hope to have her bail modified and have

10  her released tomorrow.

11       **MAGISTRATE JUDGE MCCARTHY:** Okay.  Mr. Molisani, can

12  you hear me?

13       **MR. MOLISANI:** I can.

14       **MAGISTRATE JUDGE MCCARTHY:** All right. Much of what

15  you have discussed today -- not all, but more than half, I

16  believe, has to do with the charges which have been lodged

17  against her in state court.  The federal charge is a charge of

18  being a felon in possession of a firearm.

19       Your position, I take it, is that notwithstanding

20  that, I'm allowed to consider the factors that give rise to

21  the state charges as well in determining whether she should be

22  released or detained on the federal charges; is that correct?

23       **MR. MOLISANI:** Yes, Your Honor.  With respect to the

24  nature and circumstances of the offense, yes, technically when

25  you look at the offense itself it is simply possession of that

1  firearm with a prior felony conviction, which the defendant

2  does have.

3          But I think this Court must look at all of the

4  facts and circumstances surrounding the charged conduct.

5          **MAGISTRATE JUDGE MCCARTHY:** Okay.  Mr. Davis.

6          **MR. DAVIS:** Thank you, Your Honor.  Your Honor, with

7  regard to the nature and circumstances of these events, this

8  event, Judge, there are two dynamics here.  There's a dynamic

9  within the vehicle which deals with the possession of the

10 weapon, which is the Government's purview; and then there's

11 the dynamic outside the vehicle which really has nothing to do

12 with the Government, they really have no voice there.

13         Your Honor, to go back further than the point in

14 which the Government starts showing video, my client is coming

15 from a repast.  She was there to support her husband because

16 there was a death in his family.

17         She begins to drive down the street going to make a

18 store run with a relative and another individual who she

19 really doesn't know in the back seat.  There's an unsanctioned

20 protest, unplanned protest, no permit was pulled for this

21 protest, people really didn't know about this protest.

22         My client pulls onto Bailey Avenue, a street that

23 she's frequented throughout her life.  She pulls onto Bailey

24 Avenue and there are tear gas explosions, there's a traffic

25 jam, she is parked now behind another vehicle, which

1  apparently -- well, strike that.

2              There's a white truck parked in front of her

3  vehicle boxing her in.  There are cars behind her.  There's a

4  bus to the side of her.  She has now pulled onto this

5  thoroughfare, there are officers lined across the street in a

6  phalanx military position dressed in riot gear, all black,

7  bearing weapons.

8              There are military vehicles on the street.  There

9  is traffic behind her.  There are people behind her, several

10  people.  There are discharges of gun powder, not just gunfire,

11  but there's gun powder going off in the distance because we

12  have tear gas, we have rubber bullets.

13             In the midst of this while my client is sitting in

14  traffic, according to the Government, someone in the rear

15  passenger side introduces a pistol into the situation.

16             There's no evidence that my client knowingly was in

17  the presence of this weapon, which is also an element, a

18  crucial element is knowing, my client knew that this weapon

19  was present in the car.

20             The only proof that the Government has that my

21  client became aware of this weapon is when it was first

22  introduced, when it first hung out of the window of her

23  vehicle apparently, according to the Government, and shot.  I

24  believe it was shot eight times according to the Government,

25  then it was taken back into the car.

1        Now, the Government shows us a video of someone

2   opening the front door and makes no mention of it other than

3   to say oh, look, two doors open.  That also was someone

4   attempting to escape the vehicle, Judge, because there's live

5   fire now going on behind the driver's -- the driver's seat and

6   the passenger's seat.

7        That's also consistent with someone trying to get

8   out of the car because now there's someone in the back seat

9   who is firing a gun.

10        Your Honor, if the Government is to be believed, is

11   that the plan was to sit in that traffic jam and to have the

12   person in the rear of the vehicle fire eight shots with armed

13   officers lining the streets and having struck no one with any

14   of this live fire, having eight shots miss all the officers,

15   then the plan, according to the Government, is for my client

16   to drive head first into the line or the wall of officers

17   standing in the street.  It defies logic, Your Honor.

18        My client was struck multiple times.  My client was

19   shot multiple times.  The Government cannot tell you when she

20   got shot.  Only that she got shot.  The Government can only

21   tell you the caliber of one of the rounds that was fired at

22   her, and that's the one that was lodged in her stomach:

23   Military grade .223 weapon, which is used by NATO, which is

24   used by the American military.

25        The Government cannot tell you the round that

1 grazed her back.  What the Government can tell you is that

2 there was a discharged shell casing in the back seat of her

3 car.  There was a discharged shell casing in the back seat of

4 her car that matches the weapon that was found in the back

5 seat of her car that is void of her DNA, it's void of the DNA

6 of the person in the front seat.

7 　　　　　There was a lot of shooting going on on that

8 evening, but only two people got shot: My client and the

9 person in the front seat.  The individual in the back was not

10 shot.

11 　　　　　We do not know at what point the state troopers

12 started shooting back.  Yes, I have counsel's testimony as to

13 the opinion of an unvetted professional who we haven't seen

14 any CV, we don't know whose results that Mr. Molisani just

15 recited.  Nevertheless, he's given us these results by some

16 purported member of law enforcement saying this is how it

17 happened, these are where the shots were fired from, but we

18 only have one projectile and that was the one that was lodged

19 in my client's stomach on that evening, Judge.

20 　　　　　My client pulling off is also consistent with

21 someone who has been shot going to seek help.  My client sat

22 stationary because she was in a traffic jam and if we were to

23 go back to the video which Mr. Molisani showed, you will see a

24 white SUV execute a three point turn and then move and then my

25 client pulls off.

1          My client's vehicle was not moving at a high rate

2   of speed.  The vehicle was moving, yes, it was.  And the

3   vehicle actually moved toward the hole that was being made by

4   law enforcement.  Law enforcement that was wearing protective

5   riot gear, which also covers the legs.

6          It appears as though the individual that was hit

7   actually may have tripped on his own equipment if you look at

8   the video.  If you look carefully at the video, you'll see my

9   client did not veer to the left, did not veer to the right,

10  she proceeded towards the hole that was being made by law

11  enforcement.  This is not indicative of someone who is trying

12  to cause harm to law enforcement.

13         Now, counsel would have you believe that my client

14  actually was trying to help her rear seat passenger escape.

15  Same individual who left both she and the front seat passenger

16  shot in the street, this person did not attempt to take over

17  the vehicle and continue to escape with them.  There's no

18  evidence that there was ever any meeting of the mind about

19  what took place here.

20         I believe the individual in the back seat had some

21  issues with law enforcement, I won't get into that, but it's

22  my understanding that there may have been a warrant in play

23  and that that is the person who may not have wanted to be on

24  scene with law enforcement that was going on there.

25         Most assuredly my client did not and was not part

1  of any plan to fire eight rounds in the air when there are

2  armed state troopers in front of them.

3          Now, it's obviously chaotic inside my client's

4  vehicle, Judge.  Once again, yes, there were eight shots fired

5  by the person in her back seat.  And, yes, she was shot twice

6  on that evening.  So, yes, she's panicking, she's driving, she

7  may very well have been under the influence of a narcotic on

8  that evening, Your Honor.  That's something that she's not

9  charged with and that's something that I have no data in front

10  of me to prove it to be true.

11          When we talk about the weight of the evidence,

12  Judge, once again the Government has provided no proof to show

13  that my client knew about that weapon beyond the quantum of

14  time that it was introduced outside the vehicle and then the

15  individual brought the weapon back inside of the car.

16          We have a round that was a spent shell casing

17  inside the car, once again.  Don't know how she received the

18  gunshot wound across her back.  No one can tell us the caliber

19  of bullet that caused the gunshot wound across her back, but

20  we do know that there's a spent shell casing in the back seat.

21  I want to say that one more time.

22          The Government would have you believe that these

23  facts are consistent with someone trying to escape and avoid

24  capture, but, Your Honor, I will also argue that these facts

25  are also consistent with someone who is being carjacked.  This

1   is also consistent.

2           My client was left on the side of the road bleeding

3   along with the front seat passenger.  My client did not

4   attempt to escape, though she was still in the driver's seat.

5   There's no proof that the vehicle was disabled.  There's no

6   proof that there were flat tires.

7           In fact, when -- in fact, there is proof that the

8   occupant of the back seat actually hopped through the front

9   right passenger door.  Now, I'm not sure why this took place,

10  but it appears as though whoever was in the back seat crawled

11  into the front seat.

12          So we have the person in the back seat exerting

13  some sort of control over the front seat of the car exiting

14  the vehicle and then leaving both occupants shot in the

15  vehicle and the weapon.

16          Judge, the Government can't give you a thorough

17  narrative of what happened on that evening because they don't

18  know themselves.

19          As to my client's character, the Government has

20  told you many of the things that have taken place in her past.

21  What the Government did not tell you, what Pretrial Services

22  apparently was not able to uncover in their brief conversation

23  with my client, and I believe her mother, is that my client --

24  yes, she did have an issue back in 2019 -- strike that.  2009.

25          My client at that time was in an abusive

1  relationship working her way out of it.  My client is now

2  married and the mother of four; responsible parent.  And

3  though the Government would have you believe she doesn't have

4  a work history, I must assure you Your Honor that raising four

5  children is a job in and of itself.

6           In addition to that note, Your Honor, my client is

7  also an entrepreneur.  She has an online business where she

8  sells clothes.  I believe I sent the Court pictures of the

9  site.  It's active.  She has customers.  She files her taxes.

10          **MAGISTRATE JUDGE MCCARTHY:** Mr. Davis, if I can

11  interrupt you for a second there?  And I did review the

12  submissions that you filed today, but according to the amended

13  Pretrial Services report as well as to the original report,

14  she told Probation Officer Middlebrooks that she had not been

15  employed since 8/17.

16          **MR. DAVIS:** She hasn't been employed.  She's been

17  self-employed.  Once again, I'm saying that she is an

18  entrepreneur.  She works for herself, Judge.  She also is a

19  licensed beautician.

20          So she may have told Mr. Middlebrooks that she did

21  not have a job working for someone, but she most assuredly has

22  been working for herself as evidenced by her filing taxes; and

23  she's also a licensed beautician.  Once again, Your Honor, I

24  sent you proof of that.

25          So I'm not sure the quality of the conversation

1  Mr. Middlebrooks had with my client, who was -- well, she's

2  only had Tylenol since being shot, being in the holding

3  center, but I'm not sure the quality of the conversation that

4  was had.

5            I know that, I believe, the conversation took place

6  the morning of our first appearance and I believe that the

7  document was generated -- the first, the initial document was

8  generated perhaps within an hour or so.  I'm not sure about

9  the follow-up conversation either in terms of the duration and

10  quality of that.

11           Nevertheless, my client is a licensed beautician;

12  my client does file taxes for her own business; and my client

13  is raising four children.

14           My client is currently in school working towards

15  her bachelor's and she's receiving astounding grades. I

16  believe she has a 90% average.  So my client is not someone

17  sitting around twiddling her thumbs.

18           And it should be mentioned that during the time

19  this incident took place, my client was not on probation; my

20  client was not on parole; my client was not out committing any

21  crime.  At best this is a passive, temporarily innocent

22  possession of a weapon in her vehicle from the time she became

23  knowledgeable of its existence when it was being fired in her

24  back seat.  When it was being fired in her back seat.

25           Furthermore, it appears as though all the rounds

1    may have been discharged from the weapon before it was brought

2    back into the vehicle.  No one can tell me that that gun was

3    loaded when it was brought back into the vehicle.  I'm hearing

4    that there was a live shell casing on the back seat and I'm

5    hearing there was a spent shell casing.

6              The only prints on the magazine are those of the

7    gentleman in the back seat.

8              Despite her trials and tribulations, Your Honor, my

9    client has led pretty much a law-abiding life.  She has had

10   some incidents, but nothing that rises to the level of a

11   felony.

12             Once again, Judge, when we talk about the safety of

13   the community, my client was not there as a part of any

14   protest.  She wasn't there because she was mad.  They were

15   grieving someone that they loved, they were making their way

16   to the store and they drove into war like conditions.  They

17   sat still like anyone would until all of a sudden gunfire rang

18   out.

19             Once again, the Government said that it would

20   narrate the video.  Sitting there watching the video there's

21   smoke emanating through the video.  Government makes no

22   mention as to what it is.  Government didn't explain what it

23   was.  There was no audio in that portion of the video.

24             So we have a young lady who is not military

25   trained, a young woman who has no history of involvement with

1  firearms, now driving onto Bailey Avenue, now driving onto

2  Bailey Avenue and hearing what had to be at least -- we know

3  there were eight shots at least fired from behind her, so

4  there's gunfire behind her, eight live rounds; we know that we

5  saw at least three tear gas discharges in front of her, that's

6  also an explosive device; and then we know that she was shot

7  four times by -- we know she was shot at least once, fired on

8  twice by military grade weapons.  That's a lot of shooting

9  going on, Judge.

10            I would submit to you that my client is not a

11  danger to the community because she wasn't even engaged in any

12  criminal activity.  She was going to the store giving someone

13  a ride, Judge.

14            My client has strong ties to the community as

15  evidenced by all of the people listening to this call right

16  now, Judge.  My client -- she's not a part of any militant

17  group, she's not a part of ANTIFA, she's not a part of any of

18  the narrative that was going on that night.

19             She was transient in this -- in this instance.

20  She was in a car.  She wasn't standing out on the streets

21  protesting.  She wasn't there for the reasons that the

22  Government will have you to believe.

23            **MAGISTRATE JUDGE MCCARTHY:** Mr. Davis, did you say

24  she did not know Mr. Pigram before that night?

25            **MR. DAVIS:** Judge, it's my understanding that she

1  knew him tangentially from the event that they were at.  They

2  were simply making a run to the store.  It's my

3  understanding -- I'm not sure of the quality of the contact

4  that they had.  It's my understanding that they are not

5  life-long friends that she -- she doesn't really know him to

6  say that he's a friend.  Rather, she would see him at an

7  event -- according to my recollection, he was someone at an

8  event that she was at and they were simply making a run to the

9  store.

10          **MAGISTRATE JUDGE MCCARTHY:** And the event was what?

11          **MR. DAVIS:** A repast -- her husband, because she is

12  married -- her husband -- a relative of her husband had passed

13  on and the repast was the day of this -- this protest, if you

14  will.

15          **MAGISTRATE JUDGE MCCARTHY:** Okay.

16          **MR. DAVIS:** Another thing, Judge, there were no

17  partitions on any of the side streets alerting anyone driving

18  towards the direction of this protest that it was going on.

19          The city knew about it, that's how the state

20  troopers were there.  The state knew about it because there

21  was law enforcement on the streets, but there was nothing to

22  indicate to the residents of that community that there was

23  this activity going on; you wouldn't know until you got there.

24          You wouldn't know until you pull on Bailey, which

25  has had its issues with crime over the years, and you pull on

34

1    Bailey and now there's live gunfire from multiple calibers of

2    weapons.

3              My client also purports that she was struck by

4    rubber bullets.  There's no trajectory patterns of the rubber

5    bullets that hit my client, but from what I've observed in

6    watching the news, apparently these rubber bullets can be

7    quite painful and can break the skin.

8              So, Judge, I will ask the Court to look at the

9    entire narrative and to find that my client is able to be

10   released, Judge.  She can be released on an ankle monitor so

11   she can go home and be with her kids; she can be released on

12   her own recognizance.

13             There's still state bail on her.  This is largely a

14   state issue, Your Honor.  The Government has inserted itself

15   in largely what is a state issue.

16             I would ask the Court to release her and let us

17   handle this in the state court and we will revisit this issue

18   because it's likely that the matter will be resolved there

19   anyway.

20             We don't have DNA here.  We don't have the

21   *mens rea* -- the requisite *mens rea*.  I'm not sure why the

22   Government is involved here in the first place , Judge.

23             **MAGISTRATE JUDGE MCCARTHY:** All right. Are you

24   offering any -- any proposal for bail, Mr. Davis?

25             **MR. DAVIS:** Yes, Judge.  I would ask for 5,000.  I

1    would ask for perhaps a $20,000 signature bond.  Her -- both

2    of her parents are gainfully employed as well as her husband.

3    I believe they can provide that amount in signature bail that

4    will ensure that she will come to court as they would be

5    liable for those funds.

6            She has no reason to run, Judge.  She has --

7    doesn't even have the financial wherewithal to do so, and

8    she's injured.  So she's still -- she wants to get back to her

9    primary care physician because it's my understanding that at

10   the holding center they tried to remove her staples, which

11   reopened the wound that she has, and she's still only getting

12   Tylenol.

13           So I would ask for a nominal bail given the

14   COVID-19 crisis and what may be limited financial resources.

15           **MAGISTRATE JUDGE MCCARTHY:** Okay.  Mr. Lenihan,

16   anything briefly in response?

17           **MR. MOLISANI:** Mr. Molisani, Your Honor.

18           **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, Mr. Molisani.

19   I apologize.

20           **MR. MOLISANI:** No problem.  Your Honor, I just want

21   to address a few things.  The defense indicated that Ms. Davis

22   was self-employed, but as Your Honor sort of noted, with

23   respect to the Pretrial Services report in terms of monthly

24   income, there's nothing about any sort of self-employment

25   listed at all; no income at all aside from the assistance that

1  she receives; nothing from her own business.

2           In addition, I think the Court kind of noticed

3  another thing as well and that being Mr. Davis' attempt to

4  distance Ms. Davis from the rear passenger in that vehicle.

5           She knows Semaj Pigram much better than Mr. Davis

6  is alluding to.  In her interview with the police she

7  identified him by name, used a nickname for him, identified

8  him as a friend of her husband, a close friend of her husband.

9  So these -- this person was not some stranger or someone who

10 just happened to be at the party which she happened to pick up

11 and take for a ride.  This is someone that's very close with

12 her husband and who she obviously trusted to pick up and to

13 transport him elsewhere.  It wasn't a stranger.

14          This wasn't a carjacking.  There's nothing -- no

15 evidence whatsoever that would indicate that Mr. Pigram

16 somehow took control of the vehicle and led them on this

17 chase.

18          Ms. Davis had an opportunity to speak with the

19 police and she gave an account where she essentially states I

20 don't know if I heard anything -- anyone discharging a firearm

21 in my back seat.  Initially she says no, that didn't happen.

22 Then later she says I don't know.

23          So she was protecting Mr. Pigram, and I think

24 that's evident from the way the events unfolded.  They

25 unfolded very quickly.  This wasn't a planned thing, I agree

1 with Mr. Davis.  This was not planned at all because if it had

2 been planned, it would not have gone so poorly.

3          But these events occurred and decisions were --

4 conscious decisions were made.  Once Mr. Pigram fired off that

5 gun repeatedly, they had to get out of there and Ms. Davis

6 waited until all the doors were closed and rather than turning

7 around and going in the opposite direction or choosing some

8 other path, she chose to drive right through the police line

9 and then continue on.

10          If the concern was, you know, that she needed help,

11 I mean, that was help right there.  Drive to the police, stop

12 the car, I've been shot, and receive the -- there were

13 eight -- there were medical personnel sort of on scene.  They

14 attended to the trooper that was injured.  Instead she drives

15 off and continues on.

16          And I think it remains to be seen whether or not

17 there was any gasoline left in the vehicle.  There had been

18 some mention before in the interview that Ms. Davis -- that

19 she gave to police that she was out of gas and that's why she

20 was trying to stop to get gas.  It's not clear whether or not

21 she ran out of gas rather than simply stopped on Connelly

22 Avenue.

23          So there are definitely things that are still up in

24 the air, but I think the evidence is clear that she attempted

25 to elude capture for Mr. Pigram and in doing so that is aiding

1   and abetting the crime that he committed.  And so it remains

2   the Government's position that she's too great of a danger to

3   be released on conditions, Your Honor.

4          **MAGISTRATE JUDGE MCCARTHY:** All right, Mr. Davis,

5   what time is your proceeding in state court tomorrow?

6          **MR. DAVIS:** Judge, I believe it's on for 10:30 a.m.

7          **MAGISTRATE JUDGE MCCARTHY:** Okay.  I'm going to hold

8   this hearing open.  I will write on this.  I'm not certain yet

9   what I will do, but if she's not released from state custody,

10  then right now this is an exercise in hypotheticals.  If she

11  is released, I'll want to know what the conditions are, what

12  bail if any has been required, and I will resolve this very

13  shortly, but I do want to hear what happens tomorrow.

14         **MR. DAVIS:** And point of information, Your Honor, my

15  client has been granted bail in the state case.  It's rather

16  high, but she does have bail at this point.  The only thing

17  that's holding her is this case.

18         But I will report back to the Court at the end of

19  the --

20         **MAGISTRATE JUDGE MCCARTHY:** Wait a second then.  Oh,

21  she has been granted bail (talking over each other).

22         **MR. DAVIS:** (Talking over each other).

23         **MAGISTRATE JUDGE MCCARTHY:** Make bail?

24         **MR. DAVIS:** It's $200,000.  But I believe after we

25  go through the facts of the felony hearing that I'll be able

1  to have that amount modified.

2          **MAGISTRATE JUDGE MCCARTHY:** Why don't you tell me --

3  report to me after tomorrow as to what happens with respect to

4  those requirements and then I will -- I will decide what I'm

5  going to do.

6          I'm holding the hearing open at this point.

7          **MR. DAVIS:** Thank you.

8          **MAGISTRATE JUDGE MCCARTHY:** Now, wait a second

9  before we adjourn -- yeah, we have other motions pending and

10  I'll set a briefing schedule on those.

11          I don't believe we -- do we need to exclude time,

12  Mr. Molisani?

13          **MR. MOLISANI:** Your Honor, because this detention

14  motion remains pending, I believe time is automatically

15  excluded pursuant to 3161(h)(1)(D).

16          However, I think the Court did indicate that the

17  Court was going to issue a scheduling order for this matter.

18  I guess that can be addressed at the continuance of the

19  hearing.

20          **MAGISTRATE JUDGE MCCARTHY:** I can either do that, or

21  we can discuss that today.  What's counsel's preference?

22          **MR. MOLISANI:** I'd defer to Mr. Davis.

23          **MR. DAVIS:** Judge, we can do it when I reach out to

24  the Court when we next appear and close this detention hearing

25  out.

1        **MAGISTRATE JUDGE MCCARTHY:** Why don't we do this?

2  Why don't we set another proceeding on this matter for Friday

3  the 26th -- I can do it in the morning -- by which time I will

4  advise the parties as to what my position will be with respect

5  to detention or release.

6        **MR. DAVIS:** Friday works, Your Honor.

7        **MAGISTRATE JUDGE MCCARTHY:** Okay.  How about --

8  let's say 11 o'clock.  That good for both of you?

9        **MR. MOLISANI:** I'm available then, Your Honor.

10        **MR. DAVIS:** Yes, Your Honor.

11        **MAGISTRATE JUDGE MCCARTHY:** All right. So the

12  hearing is continued until the 26th at 11 a.m., and on that

13  basis please confirm that time remains excluded through at

14  least Friday, June 26th from the Speedy Trial Act calendar; is

15  that correct?

16        **MR. MOLISANI:** Yes, Your Honor.

17        **MR. DAVIS:** Yes, Your Honor.

18        **MAGISTRATE JUDGE MCCARTHY:** Thank you.  And,

19  Mr. Davis, when you do report to me, what I would appreciate

20  just for the record is some type of filing from you tomorrow

21  just indicating what has occurred in state court relative to

22  her detention or release in that court, and copy Mr. Molisani

23  as well, okay?

24        **MR. DAVIS:** Yes, Your Honor.  As soon as it's done.

25        **MAGISTRATE JUDGE MCCARTHY:** All right, thank you,

1    all.

2            **MR. MOLISANI:** Thank you, Your Honor.

3            **MR. DAVIS:** Thank you, Your Honor.

4            (**WHEREUPON**, proceedings adjourned.)

5                        *    *    *

6            **CERTIFICATE OF TRANSCRIBER**

7

8            In accordance with 28, U.S.C., 753(b), I certify that

9    this is a true and correct record of proceedings from the

10   official electronic sound recording of the proceedings in the

11   United States District Court for the Western District of New

12   York before the Honorable Jeremiah J. McCarthy on June 23rd,

13   2020.

14

15   S/ Christi A. Macri

16   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

17

18

19

20

21

22

23

24

25